## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MITCHELL REICHWEIN, | Case No. 2:23-cv-00603-SK |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## I.
## INTRODUCTION

Plaintiff Mitchell Reichwein sues the United States for negligence under the Federal Tort Claims Act (FTCA).  While traveling on his motorcycle, Plaintiff was struck by a United States Postal Service (USPS) mail delivery truck.  The government admits liability and stipulates damages for property loss ($8,206) and past medical expenses ($114,653.05).  (ECF 72 at 2).  The parties dispute, however, whether Plaintiff is entitled to future medical expenses.  And while they agree that Plaintiff should recover general damages for past and future pain and suffering, the parties disagree about the amount.  As a result, in accordance with the parties' waiver of jury trial, the Court held a two-day bench trial on March 17 and 18, 2025 to address the remaining disputed issues over damages.  The Court heard testimony by Plaintiff and the parties' orthopedic experts who testified about Plaintiff's injuries, the medical care

he received, and what (if any) future medical care he needs.  Having now judged the credibility of the witnesses, reviewed all trial exhibits, and considered the parties' post-trial filings, the Court details here its findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

## II.
## FACTUAL FINDINGS

Based on the evidence adduced at trial, including live testimony and exhibits, together with the parties' stipulations, concessions, or admissions in the amended Final Pretrial Conference Order, the Court finds:

### A.    The Accident and Related Injuries

1.    On April 23, 2021, Plaintiff was riding his motorcycle on Altadena Drive in Altadena, California when he was struck at an intersection by a USPS mail truck driven by a USPS Postal Carrier acting within the scope of his employment.  (ECF 72 at 2).

2.    Plaintiff, who was 68 years old at the time, was returning home after running errands.  (Reichwein at 87-88, 134).[1]  He had the right-of-way, and the flow of traffic was between 30-35 miles per hour, when the USPS mail truck unexpectedly pulled in front of him from a stop sign.  (*Id.* at 89-90; EX 12; EX 41 at 13-16).  He had no time to avoid the collision. (Reichwein at 89-90; EX 41 at 14).

3.    Plaintiff was thrown from his motorcycle onto the ground and briefly lost consciousness.  (Reichwein at 89-91; ECF 72 at 2).  A Good Samaritan traveling directly behind Plaintiff witnessed the accident, recalling that the impact caused Plaintiff to do "front flips through the air,

---

[1] When applicable, the Court cites to the testimony of each witness by their last name and the page number of the reporter's transcript ("RT") in which their testimony appears.  Otherwise, RT citations are preceded by the volume number and followed by the cited page number(s).

over the hood of the mail truck." (EX 41 at 16). Paramedics eventually arrived at the scene and transported Plaintiff to Huntington Memorial Hospital by ambulance. (Reichwein at 91-92).

4.    The parties' orthopedic experts agree that Plaintiff's primary injuries after the accident included multiple back fractures (spinous process fractures); multiple rib fractures; punctured lungs on both sides (bilateral pneumothoraces); a right femur fracture; a fracture below his right knee (tibial plateau fracture); the dislocation of his left shoulder; and temporary loss of consciousness/blunt head trauma. (Enna at 14-15; Snibbe at 8, 30, 53-54). Plaintiff also suffered abrasions on his ankles. (Enna at 15). His right femur fracture was described as potentially life threatening if not immediately treated. (Snibbe at 53-54).

5.    The competing experts disagree, however, about the extent of Plaintiff's left shoulder injury. Plaintiff's retained orthopedic expert, Dr. Enna, opines that the accident also caused a massive left shoulder rotator cuff tear. (Enna at 15-16). Defendant's expert, Dr. Snibbe, on the other hand, believes that Plaintiff developed the rotator cuff tear over the years before the accident as a natural part of aging, though Dr. Snibbe concedes that the accident likely aggravated the tear. (Snibbe at 9, 12-19, 31-33).

6.    For his part, Plaintiff admits he previously injured and dislocated his left shoulder, but says he experienced no left shoulder pain in the five years before the accident. (Reichwein at 136). Plaintiff also admits he previously broke several ribs but again claims he experienced no rib pain in the five years before the accident. (*Id.* at 137). Plaintiff denies ever experiencing right leg or knee pain in the five years before the accident, though he had been knocked off his motorcycle before the underlying accident. (*Id.* at 137-38).

### B.    Past Medical Treatment

7.    Plaintiff received major medical services for his injuries at the hospital, at a rehabilitative care center, and with home health services for two to three months following the accident.  (2 RT at 73-74).[2]

8.    Right after the accident, Plaintiff was treated at Huntington Memorial Hospital for approximately one to two weeks.  (*Id.* at 73). Plaintiff was bedridden and could not use the bathroom by himself. (Reichwein at 95-96).  Due to COVID restrictions at the time, only two family members and one friend were able to visit Plaintiff at the hospital. (*Id.* at 96-97).  During his hospital stay, he experienced significant pain in his ankles, leg, ribs, and shoulder.  (*Id.* at 95).  But he received prescription-strength pain medication that managed his pain well.[3]  (*Id.* at 95-96).

9.    Plaintiff underwent multiple leg surgeries to repair his right femur and tibial plateau fractures.  (Enna at 32-34; Reichwein at 94-95; Snibbe at 33-34, 36).  The surgery to repair his fractured femur involved placing a rod or nail into the femur.  (Enna at 32-33; Snibbe at 33-34). Both the fracturing and repair of the femur bone is painful, and patients are expected to have chronic pain for a significant time even after surgery. (Enna at 32-33; Snibbe at 34-35).  Plaintiff's tibial plateau fracture was a displaced fracture (not a "hairline" fracture) and required reparative surgery.  (Enna at 33-41; Snibbe at 36, 42).  Plaintiff underwent two

---

[2] Plaintiff initially reported staying in the hospital for approximately two and a half weeks.  (Reichwein at 94).  He also reported staying at a rehabilitative care center after being discharged from the hospital for six to eight months.  (*Id.* at 98).  Plaintiff's counsel, however, later corrected this timeline.  (2 RT at 73).

[3] Plaintiff was prescribed the pain-reducing opioid Norco at some time during his treatment, though he testified that he was unsure whether that occurred at the hospital or when he was discharged to a rehabilitation center.  (Reichwein at 96, 101).

surgical procedures to repair the tibial plateau fracture: the first involved removing blood from his knee and the second was an open reduction and internal fixation procedure, which included placing a plate in the knee to ensure proper healing alignment.  (Enna at 33-34, 40-41; Snibbe at 36).  Both the injury to the tibial plateau and the effects of internal fixation can be "quite painful."  (Enna at 34-35).

11.    To repair his dislocated left shoulder, Plaintiff was placed under anesthesia and his shoulder was put back into place at the hospital.  (Enna at 15-16; Snibbe at 31).  Plaintiff complained of left shoulder pain, weakness, and limited mobility after the accident, but not before.  (Enna at 16-17, 24-25; Snibbe at 32-33).

12.    There was no specific medical procedure that Plaintiff received to repair his broken ribs, so he was left to "ride [] out" the pain "until they heal[ed]" and had to avoid coughing or laughing as much as possible for two weeks.  (Reichwein at 95; Snibbe at 53).

13.    After Plaintiff was discharged from the hospital, he was sent to a rehabilitation facility called Pasadena Park.  (Reichwein at 97).  He remained at Pasadena Park for about a month.  (Reichwein at 98; 2 RT at 73).

14.    While at Pasadena Park, Plaintiff required assistance with activities of daily living, including using the bathroom.  (*Id.* at 99).  To use the bathroom, Plaintiff also required the use of a wheelchair and a walker.  (*Id.* at 100).  Plaintiff was not allowed to be discharged from Pasadena Park until he could use the bathroom on his own.  (*Id.*).

15.    Plaintiff's ankle, legs, and shoulder hurt while he was at Pasadena Park.  (*Id.* at 100-01).  His pain was consistent, and he rated it the maximum 10 on a 10-point pain scale.  (*Id.* at 101).  Plaintiff continued

to receive prescription pain medication, including Norco, while at Pasadena Park. (*Id*.). He needed the medication to help him sleep. (*Id*.).

16.    Plaintiff spent most of his time at Pasadena Park watching television. (*Id*. at 102). He generally did not walk until later in his stay, when he began to learn how to transfer from his bed to a wheelchair so he could go outside. (*Id*.). He did not visit his home during this stay and received only a few visitors. (*Id*. at 102-03).

17.    After returning home from Pasadena Park, Plaintiff remained in a wheelchair for one week. (*Id*. at 121-22). He transitioned from using a wheelchair to using a walker as soon as he could. (*Id*. at 122). He had not been home since the morning of the accident. (*Id*. at 103-04). Plaintiff also used a hospital bed in his living room at home for comfort, including while sleeping. (*Id*. at 108). He kept the hospital bed in his living room for three to four months, though Plaintiff probably used the bed for only about one month. (*Id*. at 108, 120).

18.    Plaintiff received home health services for one month, maybe two, beginning the week he returned home. (*Id*. at 118-19; 2 RT at 73-74). When home health services were pending, Plaintiff did not need assistance using the bathroom, though he could not engage in activities outside the home or drive. (Reichwein at 120-21). He also could not do things he liked to do like "tend to the gardens, tend to the flowers," or "work in the garage." (*Id*. at 121). Instead, he primarily watched television, read, and interacted with his wife. (*Id*.).

19.    Plaintiff was in pain while he participated in home health services. (*Id*. at 119). According to Plaintiff, his whole body hurt because the doctors had "weaned [him] off of the good painkillers." (*Id*.). He was taking both ibuprofen and acetaminophen in dosages that would equate to

a standard dose of Norco. (*Id.* at 121). His left shoulder still bothered him and his right extremities were inflamed and painful to the point that he could not put much weight on them. (*Id.* at 119). He was generally uncomfortable and sleeping on and off. (*Id.* at 119-20).

20.     Plaintiff eventually transitioned from using a wheelchair to a walker, from a walker to crutches, and from crutches to a cane in four to six months. (*Id.* at 122). He is now generally able to walk without the help of a cane, though he keeps one with him in case he needs it for balance. (*Id.*). The cane is an annoyance. (*Id.* at 123).

21.     Once Plaintiff was able to drive himself, at about six months following the accident, Plaintiff underwent physical therapy at Kaiser for about a month. (*Id.* at 123). The physical therapy focused on Plaintiff's legs and arm. (*Id.* at 123-25).

22.     Plaintiff reported seeing doctors for his leg and left shoulder after receiving his procedures, including a physician who Plaintiff thought "wanted to sell [him] on doing" a reverse shoulder replacement surgery. (*Id.* at 125-26). Otherwise, the last time Plaintiff saw a medical provider (unrelated to this litigation) for treatment of the injuries he sustained because of the accident was in August 2022. (Enna at 65-66; Snibbe at 27).

### C.     **Future Treatment and Medical Care**

23.     *Right Knee*. Plaintiff's right tibial plateau fracture and right femur fracture have healed since the accident. (Enna at 65; Snibbe at 8, 24-25). Still, Plaintiff continues to walk with a limp. (Enna at 35; Reichwein at 123; Snibbe at 35). Dr. Snibbe attributed Plaintiff's limp to the femur fracture, which is causing weakness and stiffness in the right leg. (Snibbe at 35). Plaintiff will have weakness in his leg for the rest of his life. (*Id.*).

24.     Plaintiff has developed some level of post-traumatic arthritis in his right knee because of the accident. (Enna at 42-48; Snibbe at 36-37). Because of this arthritis, Plaintiff has diminished motion, pain, tenderness, and crepitation—popping, snapping, and clicking—in his right knee. (Enna at 45-46; Snibbe at 36-37). There was no evidence of limping or right knee pain before the accident in Plaintiff's medical records. (Snibbe at 37).

25.     Both orthopedic experts agree that the most reasonable first line of treatment to address the pain and functional limitations in Plaintiff's right knee is pain management by cortisone injections. (Enna at 50, 66, 79; Snibbe at 43-44). In the Southern California medical community, cortisone injections typically cost $500 for each injection, though Dr. Enna charges only $250 per injection for cash-paying patients that do not have an ongoing personal injury case. (Enna at 52, 69-70). Dr. Enna recommends that Plaintiff at first receive one to three cortisone injections over the course of one year with periodic evaluations to see how his knee responds after each injection. (*Id.* at 50-52, 79).

26.     Dr. Enna also testified that, if Plaintiff did not get better with cortisone injections, it would be reasonable to proceed with total knee replacement surgery. (*Id.* at 79). Dr. Enna described Plaintiff as a "perfect candidate" for a total right knee replacement because his injuries affect his quality of life and, without the procedure, he could suffer in pain for another 15 to 20 years. (*Id.* at 48-49). The cost of a total knee replacement is estimated at $175,000, including hardware removal (to remove the current knee plate), hospitalization, facility fee, anesthesia fee, implant fee, surgeon fee, and post-operative physical therapy. (*Id.* at 53-54).

27.     Dr. Enna also testified that he would find it reasonable if Plaintiff chose not to pursue cortisone injections at all in favor of a total

knee replacement because only total knee replacement surgery would provide a permanent fix to Plaintiff's symptoms. (*Id*. at 49-50). He would also find it reasonable for Plaintiff to pursue total knee replacement surgery sooner rather than later given the health risks involved in undergoing surgery at an older age. (*Id*. at 49). While Dr. Enna noted that Plaintiff would be a candidate for total knee replacement surgery in his October 2024 encounter note, he did not recommend a total knee replacement at that time. (*Id*. at 67). Dr. Enna has not performed a total knee replacement surgery in the past 12 years. (*Id*. at 74). Dr. Enna also admitted that Plaintiff had not exhausted all conservative treatment options to address the issues in his right knee, as he would ordinarily recommend. (*Id*. at 65).

28.    On the other hand, Dr. Snibbe testified that Plaintiff would not need total knee replacement surgery in the future because there was no progression of joint-space narrowing in Plaintiff's right knee, which would suggest osteoarthritis. (Snibbe at 23-26). Dr. Snibbe reached this opinion by comparing x-rays of Plaintiff's right knee from 2022 (before the accident) with those taken in October 2024 (after the accident). (*Id*.). Dr. Snibbe found that the joint spacing and healthy cartilage between the femur and tibia was well-maintained over that time with no indication of bone spurs suggesting significant arthritis. (Snibbe at 22-23, 26). And because Dr. Snibbe saw no bone-on-bone contact, which might indicate more severe arthritis, he opined that total knee replacement surgery would be unreasonable and unrecommended. (*Id*. at 23-26).

29.    Dr. Snibbe also noted that Plaintiff's conservative to nonexistent history of medical care for his right knee pain was inconsistent with someone who would require total knee replacement surgery. (*Id*. at

26-27).  Dr. Snibbe explained that most orthopedic doctors would recommend—and their patients would typically exhaust—conservative pain management treatment options (e.g., injections, physical therapy, etc.) before attempting invasive surgery.  (*Id.* at 26).

30.    *Left Shoulder.*  Plaintiff's left shoulder has returned to a functional range of motion—his baseline before the accident—though he cannot lift his left arm as high as his right arm by about ten degrees. (Enna at 25; Snibbe at 9-10, 19-20, 31, 33).  Plaintiff's left shoulder still bothers him because it is painful and weak.  (Enna at 16-17; Reichwein at 127). There was no evidence of pain or weakness in Plaintiff's left shoulder before the accident.  (Enna at 16-17; Snibbe at 33).  Whether Plaintiff's continuing shoulder symptoms stem from a left rotator cuff tear directly caused by the accident or a preexisting left rotator merely aggravated by the accident is medically debatable.  (Enna at 63-65).

31.    Dr. Enna attributes the continued pain, weakness, and limited mobility in Plaintiff's left shoulder to a "massive rotator cuff tear" he believes Plaintiff sustained as a result of the accident.  (*Id.* at 16-18, 20, 25).  He could not rule out, however, that Plaintiff's left rotator cuff tear was preexisting given the lack of imaging of Plaintiff's left shoulder before the accident.  (*Id.* at 63-65).  Still, he thought it unlikely that Plaintiff's rotator cuff tear was preexisting based on the combination of post-accident images he reviewed and Plaintiff's self-reported denial of any left shoulder pain before the accident.  (*Id.* at 64-65).

32.    In his experience, Dr. Enna has also seen patients with relatively new rotator cuff tears (acute tears) that can still show significant retraction on MRIs (as with chronic tears) within three to six months.  (*Id.* at 21.).  He added that, according to medical literature, the incidence of a

rotator cuff tear as a result of a traumatic shoulder dislocation is greater than 50 percent in patients older than 50. (*Id.* at 21-22). In any event, Dr. Enna concluded that, even if Plaintiff had torn his rotator cuff before the accident, that injury would still have been aggravated by the accident. (*Id.* at 22-25).

33.    Dr. Snibbe did not attribute the rotator cuff tear to the accident. (Snibbe at 9, 31). Dr. Snibbe based this opinion mainly on an MRI of Plaintiff's left shoulder taken in August 2021, four months after the accident, which revealed a significant rotator cuff tear. (*Id.* at 11-19). As Dr. Snibbe explained, the MRI showed all the tell-tale signs of a chronic tear that had to have developed over several years: the humeral head ("ball") had risen up to the point that it rubbed against the acromion bone, the rotator cuff was severely retracted to the level of the glenoid, the tendon was flattened and "wispy," severe scarring appeared on top of the glenoid when the rotator cuff retracted, and the muscle of the rotator cuff had atrophied. (*Id.* at 12-19). Yet despite those apparent chronic conditions in his left shoulder, Dr. Snibbe found based on his independent medical exam of Plaintiff in February 2024 that Plaintiff had "very good" and "functional" range of motion in his left shoulder with minimal pain. (*Id.* at 9).

34.    No matter if Plaintiff's left shoulder injury was preexisting or new, both orthopedic experts agree that the first reasonable line of treatment for pain and functional limitations in the left shoulder entails conservative care like cortisone injections and physical therapy. (Enna at 26-27; Snibbe at 47-48). As with similar injections for the knee, shoulder cortisone injections are estimated to cost between $250 and $500 per injection. (Enna at 30-31, 69-70). Dr. Enna recommends that Plaintiff receive at least two to three injections per year for at least one year with

periodic monitoring to assess efficacy. (*Id.* at 31).

35.    At the same time, Dr. Enna testified that he would recommend reverse total shoulder replacement surgery for long-term pain relief, but only if cortisone injections failed to help Plaintiff's left shoulder pain and the pain worsened. (*Id.* at 28-30; 79-80). He estimates that a reverse total shoulder replacement surgery would cost about $150,000, including facility fees, surgeon fee, anesthesia fee, implant fee, in-patient hospitalization, and post-operative therapy. (*Id.* at 30-31).

36.    That said, Dr. Enna admitted that Plaintiff did not have the degree of debilitating pain that would warrant reverse total shoulder surgery at the time of trial. (*Id.* at 69). In fact, Dr. Enna admitted that a reverse total shoulder surgery would not be the correct course of treatment for Plaintiff as of that time. (*Id.*). Dr. Enna has never performed a reverse total shoulder replacement surgery. (*Id.* at 75).

37.    By contrast, Dr. Snibbe has performed reverse total shoulder replacement surgeries over a thousand times over the course of his career and as recently as a month before trial. (Snibbe at 20). In his opinion, Plaintiff did not and would not need reverse total shoulder replacement surgery in his left shoulder at the time of trial or in the future because Plaintiff has a "very functional" range of motion and minimal pain. (*Id.* at 19-20).

38.    *Spine, Lungs, and Ribs.* Plaintiff's fractures to his spine and ribs have healed since the accident and are resolved with no need for any surgical intervention. (Snibbe at 8). The injuries to Plaintiff's lungs have also healed. (*Id.*).

39.    *Hip.* Dr. Enna believes Plaintiff will probably develop post-traumatic arthritis in his right hip in the future because of the nature of his

injuries associated with the high-energy accident (Enna at 47-48), but there is no radiographic evidence of Plaintiff having hip arthritis, (*id.* at 76). Rather, based on his independent medical exam, Dr. Snibbe found that Plaintiff has a full range of motion in his hips.  (Snibbe at 10).

40.    *Pain Management and Physical Therapy.*  Dr. Enna testified that when he saw Plaintiff in October 2024, Plaintiff complained of daily chronic pain, particularly in his left shoulder and right lower extremity. (Enna at 62).  But Plaintiff was taking no pain medication at the time of the visit.  (*Id.*).  Indeed, Plaintiff reported that he had not taken any pain medication for "a long time."  (*Id.*).

41.    Dr. Snibbe's review of Plaintiff's medical records confirmed that Plaintiff has taken no pain or anti-inflammatory medication for the last several years.  (Snibbe at 25-27).  Nor has Plaintiff ever pursued conservative pain management treatment in the two years preceding trial. (*Id.* at 26-27, 47-48, 50).  In fact, Plaintiff has never seen any pain management specialist in connection with the injuries sustained during the accident.  (Enna at 62; Snibbe at 47).  Even Dr. Enna has never prescribed Plaintiff with any medication (pain, anti-inflammatory, etc.).  (Enna at 62). And at the time of trial, Plaintiff was taking no prescription pain medications.  (Reichwein at 139).

42.    Additionally, Plaintiff's physical therapist noted in August 2022 that Plaintiff would benefit from continued physical therapy to both his shoulder and his knee.  (Enna at 65-66).  Dr. Enna disagreed with the physical therapist's opinion with respect to Plaintiff's right knee but otherwise agreed that physical therapy could improve the strength and mobility in Plaintiff's left shoulder.  (*Id.* at 65-66, 79-80).  Dr. Snibbe testified that physical therapy would also be a reasonable treatment option

for Plaintiff's right knee. (Snibbe at 42-43). In any case, the last time Plaintiff saw a physical therapist in connection with the accident—for either injury—was in August 2022. (Enna at 65-66; Snibbe at 27, 50).

### D.    **Past Economic Damages**

43.    The stipulated amount of Plaintiff's property damage is $8,206. (ECF 72 at 2).

44.    The stipulated total past medical expenses is $114,653.05. (*Id.*). Almost all of Plaintiff's past medical expenses were adjusted and paid for by insurance. (*Id.*).

45.    Plaintiff was retired at the time of the accident (Reichwein at 82) and so is not making a claim for lost wages. (ECF 72 at 2).

### E.    **Non-Economic Damages**

46.    Before retiring in 2019, Plaintiff worked for Rusnak Automotive Group for 23 years selling cars. (Reichwein at 82-83). After he retired (but before the accident), he enjoyed building motorcycles and started "playing with" antique cars and tractors. (*Id.* at 83, 85). He was also active in masonry and volunteered at church. (*Id.*). Since the accident, however, Plaintiff has been less involved with church activities, though he continues to be a mason and is still involved with antique cars. (*Id.* at 129, 132).

47.    Before the accident, Plaintiff rode motorcycles every weekend and a couple of times each night. (*Id.* at 83). Plaintiff owns six motorcycles, including the motorcycle he was riding at the time of the accident. (*Id.* at 86). He was and remains an active member of a motorcycle-riding club (the Southern California Norton Owners Club) and currently serves as its president. (*Id.* at 83-84, 146). Before the accident, he would ride with friends every weekend and participate in club-sponsored rides for club members at least once a month. (*Id.* at 84).

14

48.    Before the accident, Plaintiff worked on projects around his 100-year-old home, such as installing new roofing, painting, and landscaping. (*Id.* at 85-86). Since then, though, he has only made a minor repair to his door and no longer engages in as many repair or improvement projects around his home. (*Id.* at 132-33, 140-42).

49.    Plaintiff's left shoulder never bothered him before the accident. (*Id.* at 127, 136). Now, Plaintiff says that his left shoulder remains constantly painful and weak. (*Id.* at 127). Before the accident, he could toss 60-pound bales of hay, do farm-work, and work on cars and bikes, but now he can barely hold a steering wheel without feeling uncomfortable. (*Id.*). Even so, Plaintiff has repaired engines and a John Deere tractor since the accident. (*Id.* at 142). He also once drove his pickup truck to and from Los Angeles, California and Las Vegas, Nevada for a motorcycle auction. (*Id.* at 142-43).

50.    Plaintiff also testified that his right knee still bothers him and feels painful. (*Id.* at 127-28). He never had right knee pain or walk with a limp before the accident. (*Id.* at 128, 137).

51.    Plaintiff only began riding a motorcycle again around a year after the accident. (*Id.* at 129). He "barely" rides his motorcycles at all anymore and has missed several riding events with his friends (and, in fact, had not ridden with anyone in 2025 as of the trial date). (*Id.* at 129-30, 146). He also testified that, in the last year, he has ridden a motorcycle only one to two times with his motorcycle club. (*Id.* at 130).

52.    Since the accident, Plaintiff's motorcycle rides have left him so exhausted that he is hesitant about riding. (*Id.*). According to Plaintiff, rides are no longer as comfortable as they used to be, and he cannot ride the same distances he could before the accident because he gets too tired.

(*Id.* at 130-31). As the rides go on, his legs start to hurt, and his left arm is not able to keep up with the whole day. (*Id.* at 131-32). Before the accident, his left arm never got tired or achy after a long ride, and he never had to take over-the-counter pain medications to recover (as he does now). (*Id.* at 132).

53.    Plaintiff managed to participate in a couple longer-distance motorcycle rides since the accident: a ride to Morro Bay (approximately 150 to 180 miles total in one day) and a ride from his home to Frazier Park, California (approximately 280 miles total in one day). (*Id.* at 144-45). But because he got tired, Plaintiff completed only half of the ride in Morro Bay and otherwise had an unpleasant experience following each ride. (*Id.* at 145).

54.    At the time of trial, Plaintiff could bathe, use the restroom, feed himself, make food, brush his teeth, and do his laundry without assistance. (*Id.* at 139-40). And since the accident, he has purchased a new vintage motorcycle that has a kick-start ignition, which requires the use of his foot to start the motorcycle for riding. (*Id.* at 144).

### F.    **Credibility of Experts' Testimony**

55.    The Court finds the testimony and opinions of both Dr. Enna and Dr. Snibbe generally credible and reasonably supported, as they were based on their experiences as orthopedic surgeons, knowledge of the field, review of Plaintiff's medical records and imaging, and independent examinations of Plaintiff.

56.    But as to the questions of whether Plaintiff needs future shoulder or knee replacement surgery, the Court finds that Dr. Snibbe's opinions are considerably more persuasive because of the number of times that he has performed both such surgeries for countless patients over many

years.[4]

57.    Finally, the Court has assessed Dr. Enna's opinions on their own merits, with no weight given to the fact that he has evidently signed a lien agreement for medical expenses with Plaintiff.  (Enna at 57-61, 76-77).

## III.

## LEGAL CONCLUSIONS

The FTCA waives the federal government's sovereign immunity from suits based on the negligent or wrongful act of a government employee acting within the scope of his or her employment if a private individual in the same position as the government would be liable under the law of the state where the claim arose.  *See* 28 U.S.C. § 2674.  Thus, cases brought under the FTCA are governed by the "law of the place where the act or omission occurred."  *Id. §* 1346(b)(1).

To establish a claim for negligence under California law, a plaintiff must demonstrate "(1) a legal duty to use due care, (2) a breach of such legal duty, and (3) the breach as the proximate or legal cause of the resulting injury."  *Vasilenko v. Grace Fam. Church*, 404 P.3d 1196, 1198 (Cal. 2017) (quoting *Beacon Residential Cmty. Ass'n. v. Skidmore, Owings & Merrill LLP,* 327 P.3d 850, 853 (Cal. 2014)).  "Causation is established for purposes of California tort law if the defendant's conduct is a 'substantial factor' in bringing about the plaintiff's injury."  *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 418 P.3d 400, 404 (Cal. 2018).  As noted, Defendant does not contest liability.  (ECF 72 at 2).

---

[4] Dr. Snibbe has been an orthopedic surgeon for 20 years.  (Snibbe at 5).  He specializes in shoulder, hip, and knee surgery.  (*Id.*).  Most of his practice is dedicated to treating patients of all ages, but when he does serve as an expert in legal cases, he is most often retained by Plaintiffs. (*Id.* at 7-8).  Dr. Snibbe has performed more than 1,000 reverse total shoulder replacement surgeries and 5,000 total knee replacement surgeries throughout his career.  (*Id.* at 20, 26).

Federal courts must also use the applicable state law standard in computing compensatory damages for successful FTCA claims. *See* 28 U.S.C. § 2674; *Sedie v. United States*, 2010 WL 1644252, at *15 (N.D. Cal. Apr. 21, 2010). In California, a plaintiff can recover "the amount which will compensate for all the detriment proximately caused [by the tortious act], whether it could have been anticipated or not." *Cantu v. United States*, 2015 WL 4720580, at *28 (C.D. Cal. Aug. 7, 2015) (quoting Cal. Civ. Code § 3333). Any recoverable damages must be reasonable. *See id.* (citing Cal. Civ. Code § 3334). Plaintiff also bears the burden "to prove that his damages were caused by the tort and would not have occurred anyway because of his pre-existing conditions." *Lewis v. United States*, 2017 WL 2311874, at *6 (C.D. Cal. May 24, 2017). So even when claiming damages, Plaintiff must prove that it is "more likely than not that [his] injur[ies were] a result of [Defendant's] action." *Bowman v. Wyatt*, 111 Cal. Rptr. 3d 787, 806 (Cal. Ct. App. 2010).

### A.  **Economic Damages**

1.    The parties agree that the total amount of property damage that resulted from the accident is $8,206. (ECF 72 at 2).

2.    A plaintiff may recover for past medical expenses that were both actually and reasonably incurred. *See Howell v. Hamilton Meats & Provisions, Inc.*, 257 P.3d 1130, 1137-38 (Cal. 2011). The parties agree that the accident caused Plaintiff to sustain the following injuries: (1) right femur fracture; (2) right tibial plateau fracture; (3) left shoulder dislocation; (4) multiple rib fractures; (5) multiple spinous process fractures (back injury); (6) bilateral pneumothoraces (punctured lungs); and (7) temporary loss of consciousness/blunt head injury. (Enna at 14-15; Snibbe at 8, 28, 30). They have thus stipulated that the total amount of

past medical expenses attributable to the accident owed to Plaintiff under *Howell* is $114,653.05.  (ECF 72 at 2).

3.    Plaintiff may recover future medical expenses if he demonstrates "that from all the evidence, including the expert testimony, . . . it satisfactorily appears that such disability will occur with reasonable certainty." *Nussbaum v. United States*, 2025 WL 1453328, at *8 (C.D. Cal. May 20, 2025) (quoting *Garcia v. Duro Dyne Corp.*, 67 Cal. Rptr. 3d 100, 104 (Cal. Ct. App. 2007)).  To meet this burden, Plaintiff must show: (1) the reasonable value of each of the expected future medical charges; (2) that the future medical care, services, or supplies are reasonably certain to be needed in treating the injury; and (3) that the condition requiring future medical care is causally connected with the injuries inflicted by the defendant.  *See Cantu*, 2015 WL 4720580, at *34 (citing *Sedie*, 2010 WL 1644252, at *20); *accord* Cal. Civ. Code § 3282; *Hoffman v. S. Pac. Co.*, 281 P. 681, 686 (Cal. 1929).  An award of future medical expenses is inappropriate if the medical expenses sought are speculative.  *See* Cal. Civ. Code § 3283; *Cantu*, 2015 WL 4720580, at 34.

4.    *Knee Replacement Surgery.*  Plaintiff cannot recover the cost of future total knee replacement surgery in his right knee because he has not proved that he will need to undergo the procedure because of the injuries sustained from the accident to any degree of reasonable certainty.

5.    Plaintiff's right femur and tibial plateau fractures, while significant, have healed following initial surgical procedures.  (Enna at 65; Snibbe at 8, 24-25).  And while Dr. Enna described Plaintiff as a "perfect candidate" for total knee replacement surgery in his right knee (Enna at 48-49), he also admitted that this surgery would typically be appropriate after failing more conservative treatment options—like cortisone injections, (*id.*

at 79-80).  In fact, both Dr. Enna and Dr. Snibbe agreed that conservative treatment options like cortisone injections are the reasonable first line of procedures to address the pain and mobility issues in Plaintiff's right knee. (*Id.* at 50, 66-68, 79-80; Snibbe at 43-44).  Yet Plaintiff has never pursued or received cortisone injections—or any conservative pain management alternative—to address any reported issues in his right knee in the years following the accident and his initial treatment.  (Enna at 56-57, 62, 65-66; Snibbe at 26-27, 47-48).  So even if it is understandable why Plaintiff might *want* to pursue an immediate and permanent fix to the issues in his right knee (via total knee replacement surgery) (Enna at 49-52), any medical *need* for such a procedure is speculative.  *See Sedie*, 2010 WL 1644252, at *16 ("[E]very injured person, regardless of the manner and extent of the injury, is obligated to take reasonable steps to mitigate his . . . injuries or loss." (citing *Gurrieri v. Severini*, 330 P.2d 635, 641-42 (Cal. 1985))).

6.    Still, as a result of the accident, Plaintiff's right knee remains painful and exhibits mobility limitations (likely caused by arthritis), including expected lifetime weakness that has caused Plaintiff to walk with a limp.  (Enna at 35, 42-45; Snibbe at 35-37, 43-44).  Plaintiff's knee will not improve without medical intervention, and cortisone injections are the appropriate first line of treatment (Enna at 50, 79-80; Snibbe at 43-44). Plaintiff has shown that cortisone injections cost, at most, $500 per injection, and he will need up to three injections over one year to determine whether he will eventually need to pursue more invasive treatment options. (Enna at 52, 69-70).

7.    Thus, the Court concludes that Plaintiff is entitled to the cost of one year's worth of cortisone injections because he has adequately (if just barely) shown that this treatment option is both reasonable and necessary

to address the pain and mobility issues currently presenting in his right knee. Plaintiff is entitled to the cost of no more than three cortisone injections in his right knee for one year at $500 each.

8.     Plaintiff has otherwise presented no evidence or argument about the need or cost of other conservative treatment options (such as physical therapy) relating to his right knee.

9.     *Shoulder Replacement Surgery*. Plaintiff also cannot recover for the cost of a future reverse total shoulder replacement surgery on his left side because he has not shown that this procedure is (or will be) reasonable or necessary.

10.     Plaintiff's left shoulder dislocation was treated at the hospital, and it is no longer dislocated. (Enna at 15-16; Snibbe at 31). Thus, any potential need for a reverse total shoulder replacement surgery in Plaintiff's left arm would be to repair the rotator cuff tear in Plaintiff's left shoulder. Both orthopedic experts agree, however, that it is plausible that the rotator cuff tear developed before the accident and that the accident only aggravated this otherwise dormant and asymptomatic preexisting condition. (Enna at 22-25, 63-65; Snibbe at 31-33).

11.     But even if Plaintiff's rotator cuff tear is directly attributable to the accident, as Dr. Enna opines (Enna at 16-20), Plaintiff has not shown that he will require a reverse total shoulder replacement surgery to any reasonable degree of certainty. While perhaps Plaintiff will one day need left reverse total shoulder replacement surgery, both orthopedic experts agreed that more conservative treatment options—as opposed to surgery— are the reasonable and correct first line of treatment. (Enna at 25-27, 66; Snibbe at 26-27, 47-48). In fact, even Dr. Enna admitted that reverse total replacement surgery was not an appropriate treatment option for Plaintiff

as of the time of trial. (Enna at 69). The procedure may only be a suitable treatment option for Plaintiff *if and when* conservative treatment fails. (*Id.* at 28). But Plaintiff has not pursued or received first-step treatments like cortisone injections or physical therapy for his left shoulder issues in the several years preceding trial. (*Id.* at 65-66; Snibbe at 27). Nor has Plaintiff sought or been prescribed prescription medication for pain or inflammation for the last several years, and he was not taking prescription pain medication as of the time of trial. (Enna at 62; Reichwein at 139; Snibbe at 26-27; 47-48). Therefore, any need for a future reverse total shoulder surgery in Plaintiff's left arm is speculative.

12.    At the same time, both orthopedic experts agree that cortisone injections are the most typical and reasonable first line of treatment for Plaintiff's left shoulder pain. (Enna at 26-27, 79-80; Snibbe at 47-48). Cortisone injections cost, at most, $500 per injection. (Enna at 31). And similar to his recommendation for Plaintiff's right knee, Dr. Enna recommends cortisone injections in Plaintiff's left shoulder for as long as they are effective, but at minimum, would provide Plaintiff one to three injections over the course of one year to evaluate their efficacy. (*Id.*).

13.    Thus, Plaintiff is entitled to recover the cost of one year of cortisone injections in his left shoulder because he has adequately (if barely) shown that they are a reasonably necessary treatment option to address the pain and mobility issues in that shoulder. (Enna at 16-17, 24, 79-80; Reichwein at 127; Snibbe at 31-33, 47-48). Plaintiff is entitled to the cost of no more than three cortisone injections in his left shoulder at $500 each.

14.    Although Dr. Enna opined that physical therapy may also help address the mobility issues in Plaintiff's left shoulder (Enna at 27, 65),

Plaintiff presented no evidence or argument about the need or cost of this treatment option. Likewise, Plaintiff presented no argument or evidence about the need or cost for future medical expenses concerning any other injuries he sustained in the accident.

### B.    Non-Economic Damages

15.    "In California, a plaintiff who has established liability may recover non[-]economic damages for a wide variety of harms, including emotional distress and pain and suffering, which may include not only physical pain but also 'fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror[,] or ordeal.'" *Seferaj v. United States*, 2023 WL 5530026, at *6 (C.D. Cal. Aug. 28, 2023) (quoting *Capeluto v. Kaiser Found. Hosps.*, 500 P.2d 880, 883 (Cal. 1972) (in bank)).

16.    There is no fixed standard to calculate the amount a plaintiff may recover for pain and suffering, but any damages award for pain and suffering must be reasonable, based on the evidence and common sense, and caused by the tort. *See Duarte v. Zachariah*, 28 Cal. Rptr. 2d 88, 96 (Cal. Ct. App. 1994) ("There is no direct correspondence between money and harm to the body, feelings[,] or reputation . . . . The discretion of the judge or jury determines the amount of recovery, the only standard being such an amount as a reasonable person would estimate as fair compensation." (quoting Restatement (Second) of Torts § 912, cmt. b, (1972))); *see also Miller v. San Diego Gas & Elec. Co.*, 28 Cal. Rptr. 126, 128 (Cal. Ct. App. 1963) (to be recoverable, damages must be caused by tort). A plaintiff may recover for future non-economic damages that are reasonably certain to occur. *See Garcia*, 67 Cal. Rptr. 3d at 103-104. The award, however, may not be so excessive as to be punitive against the

United States.  *See* 28 U.S.C. § 2674.

17.    Plaintiff's request for $1,000,000 in past non-economic damages is excessive and unsupported by the evidence.  (ECF 80 at 37).  Still, Plaintiff is entitled to recover for the past pain and suffering because of the accident.  The accident was severe: Plaintiff was riding his motorcycle at the time he collided with the USPS mail carrier, and the force of the collision was so great that it caused Plaintiff to fall on the road and briefly lose consciousness.  (Enna at 14-15; Reichwein at 89-91; Snibbe at 8; EX 41 at 16).  Plaintiff also suffered significant pain, weakness, and mobility limitations because of the injuries caused by the accident, some of which were major and potentially life threatening.  (Enna at 14-15; Snibbe at 8, 28, 53-54).  Plaintiff's pain and suffering was particularly high in the first several months following the accident when Plaintiff was hospitalized (and underwent at least two surgical procedures in his right leg), required placement in a rehabilitation center, and required home health services.

18.    During this time, Plaintiff had to learn how to walk without assistive devices, initially needed assistance for daily activities, and needed prescription pain medication (or its equivalent) to manage his pain.  Plaintiff's recovery also kept him largely sedentary, so he could not participate in the hobbies or social activities he regularly enjoyed before the accident.  As time passed, however, Plaintiff regained his independence, his ability to walk (albeit, with a limp), and his ability to tend to the house and ride motorcycles (though he could not do so to the same extent that he could before the accident).

19.    Thus, after reviewing all the evidence holistically, assessing the credibility of Plaintiff's live testimony about his past and present symptoms, and comparing this case to similar cases as benchmarks, the

Court concludes that $260,000 is a reasonable amount for past non-economic damages. *See, e.g.*, *O'Reilly v. United States*, 2013 WL 6018362, at *1-4 (C.D. Cal. Nov. 12, 2013) (awarding $250,000 in non-economic damages for past pain and suffering following collision between bicycle and truck that resulted in fractured clavicle, scapula, ribs, and femur and punctured lungs, which required multiple surgical procedures and, at times, constant care); *Ream v. United States*, 2020 WL 1303429, at *6 (W.D. Wash. Mar. 19, 2020) (awarding $100,000 in non-economic damages for past pain and suffering following motor vehicle collision resulting in back surgery (after conservative treatment options failed), and where plaintiff required assistance managing daily personal care); *Sedie*, 2010 WL 1644252, at*2, 24 (awarding $175,000 in non-economic damages for past pain and suffering following collision between bicycle and USPS mail truck that resulted in neck and back injuries, intermittent pain, and inability to engage in activities plaintiff previously enjoyed).

20.    Plaintiff's request for $1,000,000 in future non-economic damages is also excessive and unsupported by the evidence. (ECF 80 at 37). Most of Plaintiff's injuries have been treated and are now healed. (Enna at 15-16, 65; Snibbe at 8-9, 24-25, 31). That said, Plaintiff has shown that the accident caused Plaintiff to develop some level of arthritis in his right knee and, at minimum, aggravated an existing rotator cuff tear in his left shoulder, both of which will likely continue to cause disruptive (but perhaps not debilitating) pain and other functional limitations in each area without medical intervention. (Enna at 16-17, 24-25, 27, 35, 42-48, 50; Reichwein at 127-28; Snibbe at 12-19, 31-33, 35-37, 43-44). Plaintiff will also continue to have weakness in his right leg for the rest of his life. (Snibbe at 35). While cortisone injections (as the reasonable next course of

treatment for Plaintiff's right leg and left shoulder) should provide temporary pain relief, Plaintiff may have to continue to receive them to maintain their efficacy (which can also diminish over time). (Enna at 25-27, 49-50). There is also a risk, to a medical probability, that Plaintiff will develop arthritis in his hip at an unknown time because of the high-energy collision. (Enna at 47-48, 76).

21.    Plaintiff has also shown that the accident will continue to have a negative effect on his ability to participate in the activities he would otherwise enjoy. Although he has completed a minor house repair, his physical limitations have and will likely continue to reduce his ability to complete major home improvement projects and work around the yard. (Reichwein at 85-86, 133-34, 140-42). His pain and other physical limitations have and will likely continue to reduce, at least to some degree, his ability to work on engines, though the Court acknowledges that he has repaired one John Deere tractor and is still involved with antique cars since the accident occurred. (*Id.* at 132, 142). At the same time, Plaintiff is still active with masonry and has not shown how any continued withdrawal from miscellaneous church activities in the future is attributable to the accident. (*Id.* at 129). In addition, Plaintiff is now able to drive and regularly attends weekly meetings for an antiques group. (*Id.* at 142-43, 146).

22.    Finally, Plaintiff has shown that his pain and other physical limitations will continue to prevent him from wanting to ride his motorcycles as often as he used to (especially on longer trips), which will also reduce some level of socialization with his motorcycle club. (*Id.* at 83-86, 129-31). At the same time, though, Plaintiff's ability and desire to ride motorcycles will not be eliminated entirely, as he has already participated

in a couple of longer motorcycle rides with his friends since the accident. (*Id.* at 144-45).

23.    Thus, after reviewing all the evidence holistically, assessing the credibility of Plaintiff's live testimony about his past and present symptoms, and comparing this case to similar cases as benchmarks, the Court concludes that $85,000 is a reasonable amount for future non-economic damages.  *Compare*, *e.g.*, *Ream*, 2020 WL 1303429, at *7 (awarding $50,000 in non-economic damages for future pain and suffering where plaintiff could not return to prior occupation, would continue to have functional limitations in bending or lifting weight, and would be more susceptible to further injury), *and Madrigal v. United States*, 2021 WL 3589328, at *5 (C.D. Cal. Aug. 13, 2021) (awarding $40,000 in non-economic damages for future pain and suffering where plaintiff became "somewhat burdensome" to his family and could no longer participate in the hobbies he enjoyed previously), *with O'Reilly*, 2013 WL 6018362, at *3-4 (awarding $200,000 in non-economic damages for future pain and suffering where plaintiff could no longer work in prior occupation, would no longer be able to squat, kneel, climb, stand for long periods, or lift heavy objects above head, and would never again be a world-class competitive cyclist).

## IV.

## CONCLUSION

Based on the foregoing factual findings and legal conclusions, the Court orders that judgment be entered in Plaintiff's favor with a total damages award of $470,859.05—comprised of (1) $8,206 in stipulated property damages; (2) $114,653.05 in stipulated past medical expenses; (3) $3,000 in nonspeculative future medical expenses; and (4) $345,000 in

combined past and future non-economic damages.

Within 21 days of this order, the parties are ordered to lodge a stipulated form of final judgment to be entered by the Court consistent with this order.

IT IS SO ORDERED.

DATED: <u>July 8, 2025</u>

_____
STEVE KIM
United States Magistrate Judge